**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PRAIRIE MANAGEMENT & DEVELOPMENT, INC., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 23-cv-53 |
| v. | ) ) | Hon. Steven C. Seeger |
| COLUMBIA MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is about insurance coverage for a construction accident. Eduardo Guzman fell two stories through a hole in a floor at a construction site, suffering serious injuries. The accident led to waves of litigation in state and federal court. The last wave in federal court involved the duty to defend. The current wave involves the duty to indemnify.

Guzman filed suit in state court against the construction site manager (Prairie Management & Development, Inc.) and the property owner (Rockwell Properties, LLC). That's the underlying litigation. Guzman did not sue his employer, TDH Mechanical, Inc.

Prairie and Rockwell believed that the employer's insurer had a duty to defend them in Guzman's suit. So the insurance company for Prairie and Rockwell (Scottsdale Insurance Company) filed a lawsuit in federal court against the insurance company for TDH (Columbia Mutual Insurance Company).

That is, the insurance company for the construction manager and the property owner sued the insurance company for the employer, seeking a declaration that the employer must pick up

the tab for defense costs. That's the duty-to-defend lawsuit. *See Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*, 18-cv-3657 (N.D. Ill. 2019).

The district court in that case ruled that Columbia (the employer's insurer) had a duty to defend Prairie and Rockwell. Basically, the court concluded that the claims in the underlying suit potentially fell within the scope of coverage under the policy, so the employer's insurer had a duty to defend. The Seventh Circuit affirmed. *See Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*, 972 F.3d 915 (7th Cir. 2020).

At that point, the state court case was ongoing. The duty to defend was ripe, but the duty to indemnify was not.

Meanwhile, back in state court, Guzman's trial date was fast approaching. Prairie and Rockwell faced the risk of significant liability. Scottsdale prodded and poked Columbia to participate in mediation, without any luck. In the end, Prairie and Rockwell settled with Guzman for several million dollars. Scottsdale and a few other insurers chipped in and paid the settlement.

Columbia (again, the insurance company for the employer) refused to contribute to that settlement. So, for the second time, Prairie, Rockwell, Scottsdale, and another insurance company filed a federal lawsuit against Columbia. That's the case at hand.

They seek a declaratory judgment that Columbia has a duty to indemnify under the policy that Columbia sold to TDH (the employer). As Plaintiffs see things, Columbia has a duty to pay the cost of the settlement because Prairie and Rockwell are "additional insureds" under that policy, and the settlement fell within the scope of coverage.

After Columbia filed an answer, Plaintiffs moved for judgment on the pleadings. They seek a declaration from this Court that Columbia has a duty to indemnify because the settlement

fell within the scope of coverage under the policy.  As they see things, they win based on the pleadings alone.

For the reasons stated below, Plaintiffs' motion for judgment on the pleadings is denied.

## Background

In administrative law, the question is often:  who decides?  In insurance law, the question is often:  who pays?  This case is a good example.

The case is about an accident that took place at a construction site not far from Wrigleyville in 2017.  The issue isn't what happened, or who is to blame.  The question is which insurance company must pay the cost of the settlement of the underlying case in state court.

### The Accident, and the Underlying Lawsuit

The accident took place at 3057 N. Rockwell in Chicago.[1]  Rockwell Properties, LLC owned the property, and Prairie Management & Development, Inc. was the construction site manager.  They share a common ownership.

Rockwell and Prairie entered into a contract with TDH to install an HVAC system at the construction site.  *See* Am. Cplt., at ¶ 18 (Dckt. No. 24); *see also* TDH-Rockwell/Prairie Contract (Dckt. No. 24-2, at 4 of 5).  They signed a contract agreeing that Rockwell and Prairie would be "additional insureds" under TDH's insurance policy, subject to certain conditions. (More on that later).

Eduardo Guzman worked for TDH, and helped to install the HVAC system at the construction site.  On the day of the accident, Guzman was working on the second floor.

---

[1]  By the look of things on Google Maps, the place is now a venue called Rockwell on the River. According to its website, it offers 20,000 square feet for corporate gatherings, private events, weddings, and galas along the Chicago River.  It boasts all three things that you could ever need:  a coffee roastery, a small-batch distillery, and BBQ.

Guzman walked down the side of a ramp and touched plywood that he believed was solid floor. *See* Guzman Dep., at 89:8-13 (Dckt. No. 24-6).

Guzman took a couple of steps, and then he fell. *Id.* at 89:13-14. The plywood apparently gave way.

Guzman fell far, and he fell hard. He fell 22 feet through a hole on the second floor of the construction site. *See* Am. Cplt., at ¶ 22 (Dckt. No. 24); *see also* Guzman Cplt., at ¶ 6 (Dckt. No. 24-3).[2]

Guzman fortunately survived, but he suffered serious injuries. He landed on his right side. *See* Guzman Dep., at 90:14-19 (Dckt. No. 24-6). He broke his wrist, and he immediately felt "bad pain." *Id.* at 93:9-10, 97:4. He fractured his pelvis and three ribs. *Id.* at 97:3-8. And he suffered a soft-tissue injury in his right shoulder. *Id.* at 108:10 – 109:19.

The wrist injury was the most serious. Guzman required multiple surgeries on that wrist. *Id.* at 100:11-12, 112:13 – 113:19. He also suffered post-traumatic arthritis. *See* Grace Barbic, *HVAC installer settles fall-injury claims for $6M*, Chicago Daily L. Bulletin (May 3, 2022, 3:02 PM), https://www.chicagolawbulletin.com/injured-hvac-worker-construction-$6m-settlement-20220503.

Guzman ultimately filed suit in state court against Prairie and Rockwell. *See* Guzman Cplt. (Dckt. No. 24-3).

Guzman alleged that Rockwell owned the construction site. *See* Am. Cplt., at ¶ 21 (Dckt. No. 24); *see also* Guzman Cplt., at 10–11 (Dckt. No. 24-3). He put the responsibility for safety

---

[2] The citations to the amended complaint refer to the amended complaint in the case at hand, meaning the case in federal court about the duty to indemnify. The citations to the Guzman complaint refer to the underlying lawsuit that Guzman filed against Prairie and Rockwell in state court. The Guzman complaint from state court is an exhibit to the amended complaint in federal court. *See* Am. Cplt. (Dckt. No. 24); Guzman Cplt. (Dckt. No. 24-3).

squarely at Prairie's feet. As the construction manager, Prairie "had overall responsibility for safety at the construction site, including the work area where [Guzman] was working at the time of his injuries." *See* Am. Cplt., at ¶ 22; *see also* Guzman Cplt., at ¶ 5.

The Guzman complaint included a long list of negligent acts and omissions. He alleged that Prairie and Rockwell "carelessly and negligently failed to supervise, inspect and monitor the construction site in order to prevent and protect [him] from falling through the unguarded opening in the floor." *See* Guzman Cplt., at Count I, ¶ 9(a),[3] Count V, ¶ 13(a) (Dckt. No. 24-3); *see also* Am. Cplt., at ¶ 23 (Dckt. No. 24). Guzman further claimed that Prairie and Rockwell "carelessly and negligently allowed the opening in the wood floor to remain open and unprotected which [Guzman] fell through and sustained serious personal injuries." *See* Guzman Cplt., at Count I, ¶ 9(c), Count V, ¶ 13(c) (Dckt. No. 24-3); *see also* Am. Cplt., at ¶ 23.

Guzman expressly blamed Prairie and Rockwell for failing to supervise the subcontractors. They "carelessly and negligently failed to supervise, inspect, monitor, and coordinate the work of the *subcontractors* on the construction site in order to prevent and protect Plaintiff from falling through the unprotected opening in the floor." *See* Guzman Cplt., at Count I, at ¶ 9(b), Count V, at ¶ 13(b) (Dckt. No. 24-3) (emphasis added); *see also* Am. Cplt., at ¶ 23 (Dckt. No. 24) (same).

A neighboring paragraph reiterated the allegation about the failure to supervise subcontractors, who dropped the ball on safety precautions. Prairie and Rockwell "carelessly and negligently failed to properly supervise the construction site and monitor work of its subcontractors, and thereby allowed its *subcontractors* to engage in the unsafe practice of not

---

[3] As an aside, there are two "paragraph 9"s in the state court complaint. That complaint goes from paragraph 9, to paragraph 10, to paragraph 9, to paragraph 10, to paragraph 11. So, in the citations above, the Court is citing the second paragraph 9 (which should be paragraph 11).

covering or guarding the unmarked opening in the floor with appropriate protection which exposed Plaintiff to the risk of falling through the opening."  *See* Guzman Cplt., at Count I, at ¶ 9(j), Count V, at ¶ 13(j) (Dckt. No. 24-3) (emphasis added); *see also* Am. Cplt., at ¶ 23 (Dckt. No. 24) (same).

Several defendants in that underlying suit filed third-party complaints for contribution against TDH, Guzman's employer.  They blamed TDH for a failure to train, a failure to supervise, and a failure to maintain a safe workplace.  *See* Third-Party Cplt. for Contribution (Dckt. No. 24-4, at 4 of 9); *see also* Am. Cplt., at ¶ 24 (Dckt. No. 24) (noting that the third-party complaint in state court alleged that "TDH negligently failed to train its employees on multiple issues, failed to maintain a safe workplace, failed to provide proper safety equipment, failed to supervise or inspect the Construction Site, failed to supervise the HVAC work of its employees including Guzman, failed to enforce its own safety rules, and failed to provide adequate safeguards to prevent injury to Guzman").

Discovery in state court addressed what happened, and how it happened.  At deposition, Prairie's representative testified that TDH, as the subcontractor, had the responsibility to maintain a safe workplace.  Prairie left it "up to subcontractors to initiate any safety meetings or job site meetings."  *See* Am. Cplt., at ¶ 25 (Dckt. No. 24); *see also* Stelzner Dep., at 230:2 – 232:1 (Dckt. No. 24-5).

Guzman testified about the fall, and what happened beforehand.  Before he fell, Guzman complained to his supervisor from TDH (Wally Wojciech) about the open hole on the second level of the construction site.  *See* Am. Cplt., at ¶ 26 (Dckt. No. 24); *see also* Guzman Dep., at 49:24 – 53:16 (Dckt. No. 24-6).

Wojciech testified that he knew about the hole in the floor before Guzman fell. *See* Am.

Cplt., at ¶ 27 (Dckt. No. 24). In fact, Wojciech told his workers to be careful near the opening –

but he did not take steps to secure the opening. *Id.*; *see also* Wojciech Dep., at 72:19 – 74:7

(Dckt. No. 24-7).

***The Employer's Insurance Policy***

A slew of insurance companies soon entered the fray.

TDH was insured by Columbia Mutual Insurance Company for the April 2016 to April

2017 policy period. *See* Am. Cplt., at ¶ 15 (Dckt. No. 24); *see also* Columbia Policy (Dckt.

No. 24-1, at 2 of 99). Under the policy, Columbia covered TDH for up to $2 million in

"Liability and Medical Expenses" "[p]er occurrence." *See* Am. Cplt., at ¶ 16; *see also* Columbia

Policy.

The policy included coverage for "Business Liability." Columbia agreed to "pay those

sums that the insured becomes legally obligated to pay as damages because of 'bodily injury',

'property damage' or 'personal and advertising injury' to which this insurance applies. We will

have the right and duty to defend the insured against any 'suit' seeking those damages.

However, we will have no duty to defend the insured against any 'suit' seeking damages for

'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance

does not apply." *See* Am. Cplt., at ¶ 16 (Dckt. No. 24); *see also* Columbia Policy (Dckt. No.

24-1, at 68 of 99).

The policy also included an "amendment" to a section titled "**Who Is An Insured**." *See*

Am. Cplt., at ¶ 16 (Dckt. No. 24). That endorsement added additional insureds, above and

beyond TDH itself.

"**Who Is An Insured** is amended to include as an insured any person or organization for whom you [*i.e.*, TDH] are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy." *See* Columbia Policy (Dckt. No. 24-1, at 34 of 99) (bold in original).

But the amendment also placed limits on when someone else is an "additional insured." "Such person or organization is an additional insured only with respect to liability arising out of your ongoing operations performed for that insured. Liability for 'bodily injury' or 'property damage' *caused* in whole, or in part, *by 'your work' arising out of your ongoing operations performed for that additional insured* and included in the 'products-completed operations hazard'."[4] *See* Am. Cplt., at ¶ 16 (Dckt. No. 24) (emphasis added); *see also* Columbia Policy (Dckt. No. 24-1, at 34 of 99) (same).

Notice the phrase "caused . . . by 'your work' arising out of your ongoing operations." *See* Columbia Policy (Dckt. No. 24-1, at 34 of 99). Prairie and Rockwell were not additional insureds under TDH's policy for any and all possible harms that could arise under the sun. Instead, they were additional insureds "only" for harm "caused" by work "arising out of [TDH's] ongoing operations performed for" Prairie and Rockwell. *Id.*

The amendment also addressed its effect on other insurance policies. "The insurance provided to the person or organization is primary insurance and we will not seek contribution from any other insurance available to that insured." *See* Am. Cplt., at ¶ 16 (Dckt. No. 24); *see also* Columbia Policy (Dckt. No. 24-1, at 34 of 99).

---

[4] As you might have noticed, the last sentence isn't a complete sentence. It is missing a verb, and maybe more. The Seventh Circuit flagged the incomplete sentence, too. *See Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*, 972 F.3d 915, 921 n.2 (7th Cir. 2020). Insurance policies aren't always the easiest documents to read, even when the grammar is right. Incomplete sentences harder.

As contemplated by the policy, TDH entered into a written contract with Prairie and Rockwell about insurance coverage. *See* Am. Cplt., at ¶ 16 (Dckt. No. 24); *see also* Columbia Policy (Dckt. No. 24-1, at 34 of 99). In essence, the contract provided that TDH would be on the hook for any damages caused by TDH.

Specifically, the parties agreed that TDH would "assume[] responsibility and liability in and for any and all damages or injury of any kind of nature whatever to all persons and to all property growing out of or resulting from the act or omission of the Subcontractor in the performance of the Work provided for in this Contract." *See* Am. Cplt., at ¶ 19 (Dckt. No. 24); TDH-Rockwell/Prairie Contract, at ¶ 14 (Dckt. No. 24-2, at 4 of 5).

TDH also agreed to defend personal injury claims "arising" from TDH's work at the construction site. The contract stated that TDH "to the extent permitted by law, agrees to indemnify, defend, save and hold harmless [Rockwell] against any and all claims, damages, loss or expenses (including court costs and attorney's fees) by reason of the liability imposed by law upon [TDH], and/or [Rockwell] for damages because of bodily injuries . . . arising out of or on account of or in consequence of the performance of this Contract where such injuries to persons . . . are due or claimed to be due to any negligence of [TDH's] employees, agents, or servants." *See* Am. Cplt., at ¶ 19 (Dckt. No. 24); TDH-Rockwell/Prairie Contract, at ¶ 14 (Dckt. No. 24-2, at 4 of 5).

The contract required TDH to submit a certificate of insurance naming Rockwell and Prairie "as Additional Insureds for the duration of the job," and do so before starting work. *See* TDH-Rockwell/Prairie Contract, at ¶ 15 (Dckt. No. 24-2, at 4 of 5). So, before beginning its work, TDH delivered an acceptable certificate of insurance to Prairie and Rockwell. *See* Am. Cplt., at ¶ 20 (Dckt. No. 24).

Prairie and Rockwell had their own insurance, too. Scottsdale Insurance Company defended Rockwell in the Guzman suit. *Id.* at ¶ 28. Scottsdale also defended Prairie, subject to a reservation of rights. *Id.*

***The Duty to Defend Lawsuit***

The coverage for additional insureds led Scottsdale to believe that TDH (the employer) had responsibility for the Guzman lawsuit.

Scottsdale believed that Columbia had a duty to defend Prairie and Rockwell under the policy that Columbia issued to TDH. So Scottsdale tendered the defense of Prairie and Rockwell to Columbia in June 2017. *Id.* at ¶ 29. Columbia, however, ignored the tender. *Id.*

Prairie and Rockwell's defense counsel tried tendering the defense again in March 2018. *Id.* at ¶ 30. Columbia refused. *Id.* at ¶ 31.

That refusal led to the duty-to-defend case in federal court. In May 2018, Scottsdale sued Columbia, seeking a declaration that Columbia "must defend and indemnify Prairie and Rockwell and reimburse Scottsdale's defense costs." *Id.* at ¶ 30.

Judge Lee agreed with Scottsdale. *Id.* at ¶ 33. In a 2019 ruling, Judge Lee held that Scottsdale had a duty to defend Prairie and Rockwell. *See Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*, 403 F. Supp. 3d 656, 658 (N.D. Ill. 2019), *aff'd*, 972 F.3d 915 (7th Cir. 2020).

Judge Lee compared the language of the policy to the allegations of the Guzman complaint. He basically took the complaint, held it up to the light of the policy, and compared the two. He followed the so-called "eight-corners rule," comparing one document to another.

Judge Lee found enough overlap to give rise to a duty to defend. The Guzman complaint faulted Prairie and Rockwell for not supervising TDH, who botched the job. Those allegations were enough to bring the Guzman complaint within the zone of potential coverage. *Id.*

10

"Because it is not 'clear from the face of the underlying complaint that the allegations set forth . . . fail to state facts to bring a case within, or potentially within, the coverage of the policy,' Columbia has a duty to defend." *Id.* at 661 (citation omitted).

In other words, Guzman sued Prairie and Rockwell for failing to supervise TDH and failing to prevent TDH from having a dangerous work environment. Prairie and Rockwell could be on the hook for TDH's negligence, because Prairie and Rockwell allegedly dropped the ball by allowing TDH to ignore a hazard. It was within the realm of possibility that Prairie and Rockwell could have liability caused by TDH's work, so the duty to defend applied.

But Judge Lee stopped short of deciding the duty to indemnify. Scottsdale's claim "requesting a declaration that Columbia has a duty to indemnify Rockwell and Prairie [was] premature," since the Guzman case remained pending. *Id.* at 662. At that point, there was no tab to pay.

The Seventh Circuit affirmed. *See Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*, 972 F.3d 915, 917 (7th Cir. 2020). The Seventh Circuit concluded that Columbia (TDH's insurer) had a duty to defend Rockwell and Prairie because the state court case potentially fell within the scope of coverage under the TDH insurance policy.

"An insurer must defend its proposed insureds in an action that is potentially within coverage. The underlying allegations do not preclude the possibility of coverage. It is not clear or free from doubt that the policy's exclusion prevents coverage. Therefore, Columbia owes a duty to defend Prairie and Rockwell." *Id.* at 924.

The Seventh Circuit agreed that the duty to indemnify was not yet ripe. "As the district court correctly concluded, the issue of indemnity can wait." *Id.*

***Settling the Underlying Case in State Court***

The issue of indemnity could "wait." *Id.* But it didn't wait forever. The issue of the duty to indemnify loomed on the horizon. And before long, it reached this Court's docket.

The insurance companies debated who would pay the cost of resolving the underlying case in state court. Columbia anticipatorily balked at footing the bill. Columbia forewarned Scottsdale that "there would be no occasion for indemnity by TDH/Columbia, and Columbia will not offer to contribute any funds on behalf of Prairie and Rockwell at mediation." *See* Am. Cplt., at ¶ 34 (Dckt. No. 24).

Scottsdale disagreed. Scottsdale demanded that Columbia "be prepared to settle Rockwell and Prairie's liability" because "their potential liability was caused, at least in part, by TDH's acts or omissions in its performance of its ongoing operations for Rockwell and Prairie." *Id.* at ¶ 35. Columbia reiterated its position: it would not indemnify Prairie and Rockwell. *Id.* at ¶ 36.

The parties in the underlying litigation went to mediation in January 2021. Guzman's counsel had proposed a $12 million settlement. *Id.* at ¶ 37. Columbia offered nothing. *Id.* The mediation stalled out. *Id.*

Meanwhile, "[a]s the Guzman Lawsuit continued, the evidence against Prairie, Rockwell, and TDH worsened, and the probability of an eight-figure verdict became more real." *Id.* at ¶ 38. The trial court denied Rockwell's motion for summary judgment, so the case was headed to trial. *Id.*

Counsel for Scottsdale asked Columbia to participate in good faith in another round of mediation with Guzman. *Id.* Columbia refused to participate. *Id.*

The evidence in the Guzman case continued to build. Multiple expert witnesses blamed Prairie and Rockwell for failing to enforce safety standards at the construction site. *Id.* at ¶ 39. Experts also blamed TDH for failing to place protections around the hole. *Id.*

By December 2021, counsel for Prairie, Rockwell, and Phoenix Community Builders, Inc. (a company in the same corporate family) believed that an adverse verdict could range from $6 million to $8 million. *Id.* at ¶ 40. Defense counsel estimated that the settlement value of the case had risen to between $3.5 million and $5 million, given "how badly discovery had gone." *Id.*

Counsel believed that Prairie could be on the hook for more than 25 percent of the total fault, which would trigger joint and several liability. *Id.* Counsel shared the liability forecast with Columbia. *Id.*

Guzman made a $5 million settlement demand. *Id.* at ¶ 41.

Counsel for Prairie and Rockwell demanded that Columbia participate in settlement negotiations in good faith. *Id.* Counsel noted the "substantial risk" of liability exceeding $5 million at trial. *Id.* Counsel also reminded Columbia that Guzman had complained to Wojciech about the hole – and that TDH took no steps to protect the opening. *Id.* But 2021 ended without a settlement.

Trial in the Guzman suit was slated to begin on April 26, 2022. *Id.* at ¶ 43. In March 2022, with trial on the near-horizon, counsel for Prairie and Rockwell lost sleep over concerns that their clients could face a verdict of $8 million to $10 million. *Id.* at ¶ 42.

Counsel for Prairie and Rockwell shared those concerns with Columbia. Counsel explained that the increased estimate was based on "more extreme jury verdicts in Cook County

in favor of plaintiffs, post-[p]andemic, as well as additional wage loss and future medical bills for Guzman." *Id.*

Counsel reiterated that Prairie could be on the hook for more than 25 percent of the total fault, triggering joint and several liability. *Id.* Counsel gave an increased settlement guess too, estimating a figure of between $4 million and $5 million for Prairie, Rockwell, and Phoenix. *Id.*

On April 8, 2022 – two weeks before trial – Guzman offered to settle for $5 million. *Id.* at ¶ 44. Of that $5 million, Prairie would pay $3 million, Rockwell would pay $400,000, and Phoenix would pay $1.6 million. *Id.*

Guzman's counsel believed that it was a generous offer. His counsel cautioned that "a Cook County jury could easily return a verdict in excess of $8,000,000 . . . . Further, we believe it is highly likely that the jury verdict will be well in excess of both Prairie and Phoenix's underlying policy limits and that they both will be held jointly and severally liable here." *Id.*

Based on Prairie's own liability estimates, its counsel thought that the demand was reasonable. *Id.* Prairie's counsel communicated to Columbia "the bases for her opinion that the $3,000,000 demand on behalf of Prairie was reasonable." *Id.* And Prairie's counsel demanded that Columbia pay its $2 million limit (under the policy issued to TDH) to settle the suit. *Id.*

Columbia stayed the course. Columbia "maintain[ed] its previously represented position that it does not owe indemnification" to Prairie. *Id.* at ¶ 45. Columbia pointed to Guzman's complaint as support. As Columbia read it, the complaint showed "conclusively that Prairie is being sued directly for its own negligence and is not being used for any bodily injury arising out of any act or omission of [TDH]." *Id.*

Meanwhile, the trial date drew closer. The parties had a pretrial conference on April 20, 2022. *Id.* at ¶ 46. Guzman attended, and so did Prairie, Rockwell, Phoenix, and their insurers.

14

Columbia declined to attend, despite requests from counsel for Prairie, Rockwell, and their insurers. *Id.*

**The Settlement**

On April 22, 2022 – just four days before the trial date – Prairie and Rockwell reached a settlement agreement with Guzman. *Id.* at ¶ 47. Prairie would pay $3.7 million, and Rockwell would pay $400,000. *Id.*

A trio of insurers footed Prairie's $3.7 million bill. Scottsdale chipped in $400,000, Liberty Insurance Underwriters Inc. paid $2.3 million, and Berkley National Insurance Company contributed $1 million. *Id.* Westfield Insurance Company picked up Rockwell's $400,000 tab. *Id.*

In exchange for contributing to the settlement, Prairie "assigned to Liberty, Berkley, and Scottsdale all of its rights under the Columbia Policy, at law, in equity, or otherwise." *Id.* at ¶ 48. Likewise, Rockwell "assigned to Westfield all of Rockwell's rights under the Columbia policy at issue, at law, in equity, or otherwise." *Id.* at ¶ 8.

TDH didn't go to trial, either. Recall that several defendants filed third-party complaints for contribution against TDH. In the end, TDH agreed to pay Guzman $500,000. *See* TDH-Guzman Settlement Release (Dckt. No. 58-2, at 2 of 6). Columbia paid the bill. *See* Columbia Check (Dckt. No. 58-3).

**This Lawsuit**

The resolution of the state court case led to the filing of the case at hand. The "wait" was over. *See Scottsdale Ins. Grp.*, 972 F.3d at 924. The time to litigate the duty to indemnify had come.

15

Plaintiffs Prairie, Rockwell, Scottsdale, and Westfield sued Columbia, seeking to recover the settlement payments. *See* Cplt. (Dckt. No. 1). The amended complaint includes three counts.[5]

Count I seeks an order declaring that Columbia breached a duty to indemnify Prairie and Rockwell and that Plaintiffs are entitled to recover $800,000 in settlement payments, plus prejudgment interests and costs. *See* Am. Cplt., at 16–17 (Dckt. No. 24). Count II is for equitable subrogation. *Id.* at 17–18. Count III alleges that Columbia violated the Illinois Insurance Code, 215 ILCS 5/155, by denying its duty to indemnify Prairie and Rockwell and breaching the policy agreement. *Id.* at 18–19.

Columbia answered the complaint. *See* Def.'s Am. Answer (Dckt. No. 49). It asserted two affirmative defenses. *Id.* at 32.

First, Columbia asserted that the Illinois Construction Contract Indemnification for Negligence Act, 740 ILCS 35/1, renders "the Policy provisions and contract clauses at issue [] void under Illinois law." *Id.* Specifically, Columbia argued that the Act comes into play because the Columbia policy purported to indemnify Prairie and Rockwell for their own negligence. *Id.*

Second, Columbia raised a set-off defense. Columbia pointed out that it previously paid $500,000 of the $2 million per occurrence limit on the Columbia policy, so only $1.5 million remains. *Id.* According to Columbia, the $1.5 million "may be insufficient to satisfy the amount sought by the Plaintiffs." *Id.*

Plaintiffs moved for judgment on the pleadings on Count I, requesting that the Court enter a judgment "declaring that Columbia breached its duty to indemnify Prairie and Rockwell,

---

[5] Plaintiffs Prairie, Rockwell, Scottsdale, and Westfield filed an amended complaint simply to correct a misnomer – they initially named "Columbia Insurance Group, Inc." as the defendant but learned that the proper defendant was "Columbia Mutual Insurance Co." *See* Pls.' Agreed Mtn. for Leave to Amend Cplt. (Dckt. No. 20).

and Scottsdale and Westfield are entitled to recoup $800,000 of their settlement payments, plus prejudgment interest and costs, and any other relief that this Court deems just and equitable under the circumstances." *See* Pls.' Mtn. for Judgment on the Pleadings, at 1 (Dckt. No. 51).

As an aside, there is a related case, too. Liberty sued Columbia to recoup the money that it paid Guzman. *See Liberty Ins. Underwriters Co. v. Columbia Mutual Ins. Co.*, 23-cv-2528 (N.D. Ill.). That (separate) case is pending before this Court as well.

### Legal Standard

A party may move for judgment on the pleadings any time "[a]fter the pleadings are closed." *See* Fed. R. Civ. P. 12(c); *Moss v. Martin*, 473 F.3d 694, 698 (7th Cir. 2007). "Judgment on the pleadings is appropriate when there are no disputed issues of material fact and it is clear that the moving party . . . is entitled to judgment as a matter of law." *Unite Here Loc. 1 v. Hyatt Corp.*, 862 F.3d 588, 595 (7th Cir. 2017).

"When a plaintiff moves for judgment on the pleadings, the motion should not be granted unless it appears beyond doubt that the nonmovant cannot prove facts sufficient to support its position, and that the plaintiff is entitled to relief." *Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*, 972 F.3d 915, 919 (7th Cir. 2020).

As the name suggests, a motion for judgment on the pleadings depends on the content of the pleadings alone. *See N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998). The pleadings include the complaint, the answer, and any accompanying written instruments attached as exhibits. *Id.* at 452–53; *see also Arethas v. S/TEC Grp., Inc.*, 2005 WL 991782, at *6 (N.D. Ill. 2005) ("[A]lthough in ruling on a motion for judgment on the pleadings a court can consider affidavits attached to a complaint or an answer to the complaint, a court cannot consider affidavits that are not a part of the pleadings.").

The standard is the same as the standard for a motion to dismiss under Rule 12(b)(6). *See Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014). "To survive a motion for judgment on the pleadings, a complaint must state a claim to relief that is plausible on its face." *Denan v. Trans Union LLC*, 959 F.3d 290, 293 (7th Cir. 2020) (cleaned up). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Wagner v. Teva Pharm. USA, Inc.*, 840 F.3d 355, 358 (7th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

When assessing a motion for judgment on the pleadings, the Court draws "all reasonable inferences and facts in favor of the nonmovant, but need not accept as true any legal assertions." *Id.*

### Analysis

Before diving in, the Court offers an overarching observation. This case comes before the Court on an unusual posture. *Plaintiffs* moved for judgment on the pleadings. But "[m]otions for judgment on the pleadings under Rule 12(c) are almost always brought by defendants." *See* 2 James Wm. Moore *et al.*, *Moore's Federal Practice* § 12.38 (3d ed. 2024).

Sometimes a plaintiff will challenge an affirmative defense out of the box. But here, Plaintiffs are going on offense. Scottsdale and the others seek judgment in their favor on their complaint. That's a big ask, because Plaintiffs are asking for a declaration that their complaint is meritorious, and that the affirmative defenses are not.

It isn't surprising that plaintiffs rarely move for judgment on the pleadings. When a court grants a plaintiff's motion for judgment on the pleadings, it basically says that the defense has no shot at winning. Granting a motion for judgment on the pleadings would mean that the court is calling the game right after kickoff.

The vast majority of the time, a plaintiff cannot prevail based simply on the pleadings. So, judgment on the pleadings comes into play in narrow circumstances. *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1368 (3d ed. 2023) ("The federal courts have followed a fairly restrictive standard in ruling on motions for judgment on the pleadings.").

When ruling on a judgment on the pleadings, a court should not "rebuff a litigant's effort to supplement the complaint or provide legal argument in support of the suit." *Johnson v. Revenue Mgmt. Corp.*, 169 F.3d 1057, 1060 (7th Cir. 1999). "[C]ourts should not allow motions for judgment on the pleadings to deprive the non-moving party of the opportunity to make its case." *Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 313 (7th Cir. 2020).

A plaintiff who moves for judgment on the pleadings has a tough hill to climb. Again, "[w]hen a plaintiff moves for judgment on the pleadings, the motion should not be granted unless it appears *beyond doubt* that the nonmovant cannot prove facts sufficient to support its position, and that the plaintiff is entitled to relief." *See Scottsdale Ins. Co.*, 972 F.3d at 919 (emphasis added). It requires something close to a *Q.E.D.* level of certainty.

That's a tall order. With that high standard in mind, the Court turns to the motion at hand. To prevail, Plaintiffs would need to show that the complaint is meritorious, and that the affirmative defenses are not.

Several hurdles stand in the way. The first hurdle is whether the settlement involved a covered claim, meaning whether there is a duty to indemnify at all. The next hurdle is whether Prairie and Rockwell settled in reasonable anticipation of liability. The next set of hurdles involve the affirmative defenses, and here, there are two of them.

## I.     The Duty to Indemnify

The first hurdle is the most basic.  The question is whether Columbia has a duty to

indemnify under its policy.  That is, the issue is whether the settlement involved a covered claim,

and if so, whether the insurer must pay some or all of the settlement.

An insurer's duty to defend is "much broader" than its duty to indemnify.  *See First*

*Mercury Ins. Co. v. Nationwide Sec. Servs., Inc.*, 54 N.E.3d 323, 330 (Ill. App. Ct. 2016).[6]  The

duty to indemnify "arises only when the insured becomes legally obligated to pay damages in the

underlying action that gives rise to a claim under the policy."  *Johnson v. State Farm Fire &*

*Cas. Co.*, 806 N.E.2d 223, 227 (Ill. App. Ct. 2004).  Before there is liability, there is no bill to

pay, so there is no duty to indemnify (not yet, anyway).

The duty to defend is about whether a claim against an insured *potentially* falls within the

scope of coverage.  But the duty to indemnify is about whether a claim against an insured

*actually* falls within the scope of coverage.  Generally speaking, a duty to defend is a wide

window compared to the narrow opening of a duty to indemnify.[7]  *See United Fire & Cas. Co. v.*

*Prate Roofing & Installations, LLC*, 7 F.4th 573, 579–80 (7th Cir. 2021).  It's the difference

between "it might fit" and "it does fit."

---

[6]  Under Illinois choice-of-law rules – which apply to the case at hand, since this Court sits in diversity – forum law applies unless there is an actual conflict with another state's law or both sides agree that forum law doesn't control.  *See Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021).  "Substantively, the parties agree Illinois law applies."  *Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*, 972 F.3d 915, 919 (7th Cir. 2020).  So, the Court will apply Illinois law.

[7]  The duty to defend is *generally* broader than the duty to indemnify.  That said, it is possible to have a duty to indemnify without a duty to defend.  A good example is when there is no underlying lawsuit against the insured.  Sometimes the "duty to indemnify is separate from and independent of the duty to defend."  *See Keystone Consol. Indus., Inc. v. Employers Ins. Co. of Wausau*, 456 F.3d 758, 762 (7th Cir. 2006); *Sokol & Co. v. Atlantic Mut. Ins. Co.*, 430 F.3d 417, 421 (7th Cir. 2005) ("The two duties of the insurer – defense and indemnification – are distinct; while the duty to indemnify may sometimes nest inside the duty to defend, that will not always be the case.").

"Once an insured has incurred liability as a result of the underlying claim, an insurer's duty to indemnify arises only if the insured's activity and the resulting loss or damage actually fall within the policy's coverage." *First Mercury Ins. Co.*, 54 N.E.3d at 330.

But sometimes a complaint against an insured includes a wrinkle. Sometimes a complaint will include covered claims and non-covered claims. And sometimes an insured will settle a case that involves both covered claims and non-covered claims. Courts have wrestled with how to handle settlements that contain a potential mixture of covered and non-covered claims. *See* Allan D. Windt, 2 Insurance Claims and Disputes § 6:31 (6th ed. 2024) (summarizing the different approaches in various states, including the "larger settlement" rule and the "relative exposure" rule).

Settlements can pose special challenges, because the whole point is to achieve finality without litigating everything to the nth degree. That is, all too often, settlements can be a black box. It can be difficult to figure out the merits of each of the claims when the parties didn't finish litigating.

Requiring an insured to litigate the merits of the underlying case in an insurance coverage case – after *settling* the underlying case – would deprive everyone of a value of settlement: repose. A big benefit of settlement is burying the hatchet before knowing the final answer.

Figuring out the merits of the underlying case to obtain insurance coverage would devolve into mini-trials, too. It would put the insured in the awkward position of litigating against itself. In effect, the insured would have to flip sides, and go from fighting the underlying case and pointing out its weaknesses (on the one hand) to promoting the underlying case and pointing out its strengths (on the other). An insured would get the bends by going from "the claim was lousy" to "the claim was compelling." *See Commonwealth Edison Co. v. National*

*Union Fire Ins. Co.*, 752 N.E.2d 555, 566 (Ill. App. Ct. 2001) ("[R]equiring an insured . . . to establish actual liability in order to receive indemnification would place the insured in the difficult position of having to refute liability in the underlying lawsuit and then, after obtaining a settlement, turn around and prove its own liability in order to succeed in a subsequent insurance coverage action.").

Ascribing settlement value to each of the settled claims isn't easy, either. When the parties have put their pencils and their swords down, it is hard to know how much of a settlement is attributable to covered claims as opposed to non-covered claims. It is hard to untangle covered and non-covered claims when they are all rolled up into one big settlement. Covered and non-covered claims are often braided together and baked into one settlement loaf.

The Seventh Circuit predicted how Illinois courts would handle that issue in *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339 (7th Cir. 2010). The Seventh Circuit believed that Illinois courts would apply a "primary focus" test. *Id.* at 352. Under that standard, there is no need to allocate a settlement between covered claims and non-covered claims, as long as covered claims were a "primary focus" of the case against the insured.

"[O]ur prediction is that Illinois courts, in cases in which it is possible that none of the settlement was attributable to the dismissal of claims for damage covered by the insurer's policy, would evaluate whether a 'primary focus' of the claims that were settled was a potentially covered loss (burden on the insured). Conversely, if it can be established that the claims were not even potentially covered (burden on the insurer), then the insurer is not required to reimburse the settlement." *Id.*

That is, when "the parties contest whether the settlement was made in anticipation of covered claims, the burden should be on the insured to prove coverage of the settlement in the first place and then on the insurer to prove the existence of exclusions barring coverage." *Id.*

At bottom, the question is "whether a primary focus of the underlying action was a covered loss." *Id.* If so, then the insurer must pay the full amount of the settlement, unless the insurer shows that an exclusion applies, and unless the settlement was not made in reasonable anticipation of liability. *Id.* at 350–52; *see also Federal Ins. Co. v. Binney & Smith, Inc.*, 913 N.E.2d 43, 54 (Ill. App. Ct. 2009) ("Here, there is no way to decipher how much, if any, of the *Schwab* settlement was attributable to the warranty claims. To do so would require a mini-trial. . . . We find Binney was not required to allocate the liability within the settlement."); *Commonwealth Edison Co. v. National Union Fire Ins. Co.*, 752 N.E.2d 555, 565 (Ill. App. Ct. 2001) ("Despite the additional independent allegations against Edison, Asplundh's allegedly negligent tree trimming was a primary focus of the litigation. We therefore find that plaintiff entered into the settlement under the reasonable anticipation that it would have been found at least partially liable for Diana Fierce's death as a result of the allegedly negligent tree trimming by Asplundh.") (rejecting a request to allocate a settlement between covered and non-covered claims).

The Seventh Circuit predicted it right. The Appellate Court of Illinois later confirmed that Illinois law looks to whether a covered claim was a "primary focus" of the litigation against the insured. *See Rosalind Franklin Univ. of Med. & Sci. v. Lexington Ins. Co.*, 8 N.E.3d 20, 39 (Ill. App. Ct. 2014) (internal quotation marks omitted).

"In cases where an insured enters into a settlement that disposes of both covered and non-covered claims, the insurer's duty to indemnify encompasses the entire settlement if the

covered claims were 'a primary focus of the litigation.'"[8]  *Id.* (internal quotation marks omitted). "Conversely, if the 'primary focus' of the claims that were settled is not a covered loss, then the insurer is not required to reimburse the settlement."  *Id.* at 40.

The Seventh Circuit has followed that approach in a few recent cases.  The question is "whether the covered claims were 'a primary focus of the litigation.'"  *See Selective Ins. Co. of South Carolina v. Target Corp.*, 845 F.3d 263, 271–72 (7th Cir. 2016).  If so, then the insurer has a duty to indemnify "for the entire cost it incurred settling" the litigation.  *Id.* at 272; *see also Astellas US Holding, Inc. v. Federal Ins. Co.*, 66 F.4th 1055, 1066 (7th Cir. 2023) ("Put another way, if [the insurer] could show that the settlement payment was 'not even potentially covered,' then it would not need to cover [the insured's] settlement.").[9]

_____

[8]  The state appellate court did not elaborate on what it means for a covered claim to be "a primary focus" of the underlying case.  But notice that the court used the phrase "*a* primary focus," instead of "*the* primary focus."  *Id.* at 39 (emphasis added).  That language suggests that the covered claim must have played a significant role in the underlying case, but did not have to play the predominant role.  *See Commonwealth Edison Co.*, 752 N.E.2d at 565 ("Based on this record, it is clear that Fierce intended to show that a fallen power line caused Diana Fierce's death and that improper tree trimming was at least a *major contributing factor* to the damage to the line. . . .  Despite the additional independent allegations against Edison, Asplundh's allegedly negligent tree trimming was *a primary focus* of the litigation.  We therefore find that plaintiff entered into the settlement under the reasonable anticipation that it would have been found at least *partially* liable for Diana Fierce's death as a result of the allegedly negligent tree trimming by Asplundh.") (emphasis added).  The standard does not seem overly rigorous, given the reluctance of state courts to get into the weeds of the relative value of the claims.  Illinois courts have shown no appetite for allocating a settlement between covered claims and non-covered claims, so courts should not resurrect that approach by strictly applying the "primary focus" test.  It should not devolve into an exercise of ascribing different values to different claims, because the whole point of the primary focus test is to avoid that very exercise.  The standard seems forgiving, too, given the policy in favor of settlement.  The meaning of that phrase seems up in the air, but by the look of things, the standard does not seem to be very high.  For example, the Seventh Circuit in *Selective Insurance* devoted only a few sentences to whether covered claims were a "primary focus" of the underlying litigation.  *See Selective Ins. Co. of South Carolina*, 845 F.3d at 271–72.  That brief treatment was enough, even though the district court did not address the issue at all.  Overall, the idea seems to be that the whole settlement is covered if a covered claim was a meaningful part of the underlying case against the insured.  That said, the parties haven't briefed the meaning of the phrase "a primary focus," so this Court doesn't reach it.

[9]  That expression of the standard could be a little confusing, because it is not exactly "put[ting]" the standard "another way."  It is true that there is no coverage if the settlement payment was not potentially covered.  But that's not the flipside of the "primary focus" test.  The opposite of "a primary focus" is not "non-existent," meaning no potential for coverage.  The opposite of "a primary focus" is "*not* a primary focus."  The key is the word "primary."  It is possible for a covered claim to exist, but not be a "primary

The bottom line is simple. The test is whether a covered claim was a primary focus of the litigation against the insured. If it was, then there is coverage for the *entire* settlement, even if the settlement also included non-covered claims. If it wasn't, then there is no coverage for *any* of the settlement. It's all or nothing.

Here, the question boils down to whether a covered claim against Prairie and Rockwell was a primary focus of the Guzman litigation. Or more precisely, the question is whether it is *beyond doubt* that a covered claim against Prairie and Rockwell was a primary focus of the Guzman litigation. Again, the "beyond doubt" standard applies because the motion at hand is a motion for judgment on the pleadings. *See Scottsdale Ins. Co.*, 972 F.3d at 919.

That question requires the Court take another look at the scope of coverage for additional insureds. Under the policy, Columbia agreed to provide coverage for additional insureds "only with respect to liability arising out of [TDH's] ongoing operations performed for [Prairie and Rockwell]." *See* Columbia Policy (Dckt. No. 24-1, at 34 of 99).

The policy continued with a choppy half-written incomplete sentence: "Liability for 'bodily injury' or 'property damage' caused in whole, or in part, by '[TDH's] work' arising out

---

focus" of the case against the insured. One could imagine a situation where a covered claim is not a primary focus of the litigation against the insured, but the claim is potentially covered. For example, suppose a plaintiff sues an insured and bring 10 claims, and only 1 of the 10 claims is covered. The covered claim might not be a primary focus of the litigation. But the settlement payment could be potentially covered if it applied to all 10 claims, including 9 non-covered claims and 1 covered claim. That is, there is daylight between a claim that is the primary focus of the case, and a claim that is not potentially covered at all. There is a middle ground between those two poles – a covered claim could be in the case, but *not* the primary focus of the case. Framing the issue in terms of whether a covered claim is "a primary focus" seems to be the way to go. It is easy to understand. The Illinois Court of Appeals accurately stated the flipside of the standard in *Rosalind*. "Conversely, if the 'primary focus' of the claims that were settled is not a covered loss, then the insurer is not required to reimburse the settlement." *See Rosalind Franklin Univ. of Med. & Sci.*, 8 N.E.3d at 40 (internal quotation marks omitted). Also, the phraseology in *Astellas US Holding* might be confusing because it seems to import the language from the duty-to-defend context (about *potential* coverage) into the duty-to indemnify context (about *actual* coverage). The point seems to be that the duty to indemnify does not apply to any of the settlement if there is no scenario in which anything is covered. An insurer doesn't have to pay anything if nothing is covered.

of [TDH's] ongoing operations performed for that additional insured and included in the 'products-completed operations hazard'." *Id.* In other words, by the look of things, Columbia covered Prairie and Rockwell for losses caused in whole or in part by TDH's work.

As the Seventh Circuit pointed out, the language in Guzman's complaint opened the door to the possibility that Prairie and Rockwell could be "liable to Guzman based on and arising out of TDH's then-on-going operations performed for them." *Scottsdale Ins. Co.*, 972 F.3d at 920. "The underlying suit suggests, and does not foreclose the possibility, that some fault lies with TDH. The underlying suit suggests, and does not foreclose the possibility, that any liability of Prairie or Rockwell arises out of TDH's then-ongoing operations performed for Prairie and Rockwell." *Id.*

The complaint was the starting point for the duty to defend. But the complaint is not the ending point when it comes to the duty to indemnify. To reach that question, this Court needs to consider what the parties actually litigated. And the Court needs to figure out whether a claim about TDH's negligence was a "primary focus" of the case.

Plaintiffs think that Prairie and Rockwell's liability to Guzman obviously arose from TDH's work. They contend that "there was a clear path to liability for Prairie and Rockwell for their failure to supervise TDH, which allowed TDH to leave the second floor opening uncovered and unguarded, which in turn, allowed Guzman to fall through the opening, thereby suffering injuries." *See* Pls.' Mem. in Support of Mtn., at 14 (Dckt. No. 52).

Columbia disagrees. It "asserts that the engineered settlement in the Guzman Lawsuit was premised on the negligence of Prairie and/or Rockwell – not TDH." *See* Def.'s Mem. in Opp. to Mtn., at 21 (Dckt. No. 58).

26

The Guzman complaint put forward a multi-faceted theory of negligence. Part of the complaint alleged that Prairie and Rockwell were liable because of *TDH*'s negligence. The idea is that Prairie and Rockwell messed up by failing to prevent TDH from messing up. *See, e.g.*, Guzman Cplt., at 3 (Dckt. No. 24-3) ("Defendant [Prairie] carelessly and negligently failed to supervise, inspect, monitor, and coordinate the work of the subcontractors on the construction site in order to prevent and protect Plaintiff from falling through the unprotected opening in the floor"); *id.* at 14 ("Defendant [Rockwell], in one or more combinations, carelessly and negligently failed to properly supervise the construction site and monitor work of its subcontractors, and thereby allowed its subcontractors to engage in the unsafe practice of not covering or guarding the unmarked opening in the floor with appropriate protection which exposed Plaintiff to the risk of falling through the opening.").

But part of the complaint also alleged that Prairie and Rockwell were liable because of *their own* actions, separate and apart from TDH. *Id.* at 4 (accusing Prairie of violating workplace safety regulations); *id.* at 13 (accusing Rockwell of same).

Simply put, Guzman brought claims that fell within the Columbia policy's coverage, because some of the claims depended on TDH's negligence. And Guzman also brought claims that fell outside the scope of coverage, because some of the claims did not depend on TDH's negligence. The question, then, is whether the claims about TDH's negligence were a "primary focus" of the litigation.

On this record – which isn't even a *record* – it is hard to say. This Court simply has the pleadings, albeit with a slew of exhibits. This Court has what it has, but it doesn't know what it doesn't know. It is more than a little difficult to say, based on the pleadings alone, that the claims about TDH's negligence were a primary focus of the Guzman case. That conclusion is

especially true given the level of epistemological certainty required for a motion for judgment on the pleadings.

To be sure, Plaintiffs have pointed to deposition testimony from the Guzman suit suggesting that Guzman had evidence to prove up his theory about TDH's negligence. *See* Am. Cplt., at ¶¶ 25–27 (Dckt. No. 24). But Guzman put forward a few theories – some of which involved TDH's negligence, and some of which did not. A few lines of deposition testimony is not enough to put the "primary focus" of the settlement beyond doubt. *See Rosalind Franklin Univ. of Med. & Sci.*, 8 N.E.3d at 39.

Besides, the Court is reluctant to consider deposition testimony in ruling on a judgment on the pleadings. The Court can consider "written instruments" attached to the pleadings, which the Seventh Circuit has interpreted to include affidavits, letters, and contracts. *See N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 453 (7th Cir. 1998). But deposition testimony falls outside of the "written instrument" bucket. *Id.* at 453 n.5; *Moore v. Lee*, 2018 WL 6310273, at *2 (W.D. Wis. 2018) (opining that deposition transcripts from a prior suit did not constitute "instruments").

At this early stage, it is too early to declare whether claims about TDH's negligence were a primary focus of the underlying case. Plaintiffs have put the ball in play, by showing that claims about TDH's negligence were part of the case. But for now, Plaintiffs have not done enough to show that the issue is so clear-cut that this Court should blow the whistle and call the game.

In sum, this Court declines the invitation to declare, based on the pleadings alone, that it is beyond doubt that claims about TDH's negligence were a "primary focus" of the Guzman

case. Maybe the Court will reach that conclusion someday. But today is not the day, because the Court does not have a record to go on.

## II.      Reasonable Anticipation

The next question is whether Prairie and Rockwell settled in reasonable anticipation of liability. Strictly speaking, there is no need to reach that issue, given the ruling on the last issue. Even so, the Court will touch on the reasonable anticipation of liability because the Court lands in the same place, for the same reason.

"If an insured settles an underlying claim prior to verdict, it must show that it settled an otherwise covered loss in reasonable anticipation of liability." *Fed. Ins. Co. v. Binney & Smith, Inc.*, 913 N.E.2d 43, 48 (Ill. App. Ct. 2009) (cleaned up). An insured does not need to show actual liability as long as it shows potential liability based on the facts known at the time. The settlement amount must be reasonable considering (1) the size of the possible recovery and (2) the likelihood of the opposing party's success in the underlying dispute. *See Fox v. Admiral Ins. Co.*, 2016 WL 3520145, at *3 (N.D. Ill. 2016); *see also U.S. Gypsum Co. v. Admiral Ins. Co.*, 643 N.E.2d 1226, 1243–44 (Ill. App. Ct. 1994). Reasonableness turns on the likelihood of the loss, and the amount of the potential loss.

"The burden of proving reasonableness falls on the insured both out of fairness, since the insured was the one who agreed to the settlement, and out of practicality, since the insured will have better access to the facts bearing upon the reasonableness of the settlement." *Binney & Smith, Inc.*, 913 N.E.2d at 49. "The insurer, however, retains the right to rebut any preliminary showing of reasonableness with its own affirmative evidence bearing on the reasonableness of the settlement agreement." *Id.*

Plaintiffs point to the estimates provided by counsel for both Guzman and Prairie/Rockwell. *See* Am. Cplt., at ¶¶ 42, 44 (Dckt. No. 24). Both sets of counsel estimated that an adverse jury verdict could total $8 million to $10 million. *Id.*

Columbia argues that Plaintiffs failed to meet their burden to show reasonableness, since they relied on "legal conjecture that constitutes hearsay." *See* Def.'s Mem., at 21–22 (Dckt. No. 58). Plaintiffs take issue with Columbia's "insinuation" that "counsel's opinions are [] conclusory or subjective characterizations," arguing that "counsel's evaluation . . . [is] based on a thorough review of the evidentiary record in the Underlying Lawsuit." *See* Pls.' Reply, at 5 (Dckt. No. 65).

Plaintiffs may be right, but the Court doesn't have the full evidentiary record from the Guzman suit before it. The Court simply has counsel's letters. *See, e.g.*, 12/7/21 Letter (Dckt. No. 24-18); 3/4/22 Letter (Dckt. No. 24-19). And counsel's letters are not enough to show, as a matter of law, that the settlement was in reasonable anticipation of liability.

Once again, this Court is faced with a request to declare a winner right after kickoff. At this early stage, it is too early to declare beyond doubt, based on the pleadings alone, that the parties settled in reasonable anticipation of liability.

## III.    Set-Off

It is too early to say that Columbia has a duty to indemnify, and that the parties settled the underlying case in reasonable anticipation of liability. So strictly speaking, there is no need to get into the affirmative defenses. Plaintiffs haven't yet cleared the first pair of hurdles, so the later hurdles can wait.

Even so, the Court offers one side note about the set-off. Columbia argues that the Court cannot grant judgment on the pleadings because it has pled an affirmative defense of "set-off"

30

(since it paid $500,000 to settle Guzman's claim against TDH). *See* Def.'s Mem., at 1–2 (Dckt. No. 58).

Plaintiffs believe that "whether Columbia may be entitled to a set-off has no bearing on its having a duty to indemnify Prairie and Rockwell." *See* Pls.' Reply, at 7 (Dckt. No. 65). They contend that the Court can determine whether Columbia owed a duty to indemnify without addressing "the amount and who gets what amount of the judgment" just yet. *Id.*

Plaintiffs poke at whether a right to a set-off even counts as an affirmative defense, pointing out that affirmative defenses typically say why a plaintiff can't recover *at all*, not why a plaintiff can't recover *in full*. *Id.* at 6–7.

"An affirmative defense is a defense that 'gives color to [the plaintiff's] claim but asserts new matter which defeats an apparent right in the plaintiff.'" *Rankins v. Sys. Sols. of Kentucky*, 2021 WL 5415148, at *2 (N.D. Ill. 2021) (quoting *Hartmann Realtors v. Biffar*, 13 N.E.3d 350, 359 (Ill. App. Ct. 2014)). Because a claim for set-off "does not destroy the plaintiff's right of action," it is not considered an affirmative defense at all. *Ace Hardware Corp. v. Marn, Inc.*, 2008 WL 4286975, at *8 (N.D. Ill. 2008).

Instead, a set-off claim is treated as a counterclaim under Federal Rule of Civil Procedure 13. *See Karum Holdings LLC v. Lowe's Cos., Inc.*, 2017 WL 5593319, at *3 (N.D. Ill. 2017), *aff'd*, 895 F.3d 944 (7th Cir. 2018).

So, the Court agrees with Plaintiffs. The duty to indemnify is a freestanding issue that exists separate and apart from the existence of a set-off. That is, the right to a set-off does not play into the Court's calculus on whether a duty to indemnify exists. A set-off is about a reduction of liability, not an elimination of liability.

The Court does not mean to suggest that the right to a set-off has no effect on how much money Columbia might owe Plaintiffs. Columbia ponied up $500,000 on the policy already, and the policy capped its liability at $2 million per occurrence. The $500,000 payment may well reduce how much Plaintiffs can recover here – and how much Liberty can recover in its case. But the set-off does not affect whether Columbia had a duty to indemnify in the first place. The set-off is the tail, and the tail can't wag the dog.

## Conclusion

For the reasons stated above, Plaintiffs' motion for judgment on the pleadings is hereby denied.

Date:  March 18, 2024

_____

Steven C. Seeger
United States District Judge